**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-03353-DDD-NRN

Teymur Mehdiyev
      Plaintiff/Counter-defendant

v.

Qatar National Tourism Council
a/k/a Qatar Tourism Authority,
a Government Authority of Qatar,

      Defendant/Counterclaimant.

-----------------------------------------------------------

Qatar Airways Group Q.C.S.C.,
a Qatari Corporation,

      Counterclaimant,
v.

Teymur Mehdiyev, an individual,

      Counter-defendant.

---

**MOTION FOR PARTIAL SUMMARY JUDGEMENT OF NO CYBERSQUATTING**

---

Plaintiff Teymur Mehdiyev hereby moves for partial Summary Judgement in favor of his claim for declaratory judgement of no cybersquatting under 15 U.S.C. § 1125(d), *i.e.*, the Anticybersquatting Consumer Protection Act ("ACPA"), against Defendant Qatar National Tourism Council ("NTC") with respect to the lawfully acquired <*visitqatar.com*> domain name owned by Mehdiyev.

1

Counsel for Mehdiyev and counsel for NTC have conducted a conference regarding the subject matter of this Motion pursuant to D.C.COLO.L.CivR 7.1(a), and NTC will oppose.

## I.      INTRODUCTION

To prevail on the ACPA in this case, it must be shown that the <*visitqatar.com*> domain name in dispute was "identical or confusingly similar to a mark that was distinctive *at the time of registration*." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011) (quoting 15 U.S.C. § 1125(d)(1)) (internal quotation marks omitted) (emphasis in original).

The question of law presented in this motion is whether "the time of registration" under the ACPA is only when the domain name was registered (which was the holding in *GoPets*), or whether the statutory language includes subsequent re-registrations, renewals and transfers. There is a circuit split on this question, and Mehdiyev believes *GoPets* represents the correct approach.

The public record shows that the <*visitqatar.com*> domain name was registered in June 2004, which is eleven years before when NTC alleged it first starting using "Visit Qatar" in October 2015. Under these facts, if the Court decides to follow *GoPets*, then Mehdiyev prevails as a matter of law that there was no cybersquatting under the ACPA. If the Court decides to reject *GoPets*, then there may still remain genuine issues of material fact in dispute regarding whether NTC can establish common law trademark rights through acquired distinctiveness by its use of the "#visitqatar" hashtag and whether Mehdiyev acquired the domain name in January 2016 in good faith that may require a trial on the merits.

As will be discussed herein, the approach of *GoPets* better promotes efficiency and equity.

## II.     BACKGROUND

Plaintiff Mehdiyev is an individual who resides in Azerbaijan. [ECF 1]. He owns the <visitqatar.com> domain name that was the subject of a Uniform Domain-Name Dispute-Resolution Policy ("UDRP") proceeding between Mehdiyev and Defendant Qatar National Tourism Counsel ("NTC") in 2019. [ECF 1]. The Complaint filed by Mehdiyev challenged the adverse result of that UDRP proceeding.

The <visitqatar.com> domain name that is the subject of this dispute was created in June 2004. Exh. A.[1]  Mehdiyev later acquired the <visitqatar.com> domain name in January 2016.

NTC is the government tourist agency for the country of Qatar, and NTC has alleged that it has used "Visit Qatar" since at least October 2015. [ECF 14 at NTC Counterclaim ¶¶ 8–19]. But before Mehdiyev acquired the <visitqatar.com> domain name in January 2016, this use appears mostly limited to social media handles such as "@VisitQatar" [ECF 14 at NTC Counterclaim ¶¶ 10–14] and the "#visitqatar" hashtag [ECF 14 at ¶ 14]. The website at www.visitqatar.gov.qa referenced by NTC in its Counterclaims, however, was not active until August 2016 [ECF 14 at NTC Counterclaim ¶ 9], which was several months after Mehdiyev acquired the domain name.

With respect to this motion, the relevant facts are that NTC did not start using "Visit Qatar" until more than a decade **after** the <visitqatar.com> domain name was created and registered.

### Statement of Undisputed Material Facts

1. The <visitqatar.com> domain name was registered in June 2004.  Exh. A at 1.

2. NTC began using "Visit Qatar" in October 2015. [ECF 14 at NTC Counterclaim ¶ 8].

---

[1] The creation date of the registration for the <visitqatar.com> domain name is part of the pubic record as reflected in the whois database search result printed and attached as Exhibit A.

### III. LEGAL STANDARDS

#### A. Summary Judgment

The summary judgment procedure is designed to isolate and dispose of factually or legally unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Under Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact. *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). "A fact in dispute is 'material' if it might affect the outcome of the suit under the governing law; the dispute is 'genuine' if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party." *Newland v. Stevinson Toyota E., Inc.*, 505 F. Supp. 2d 689, 696 (D. Colo. 2007) (citations omitted).

#### B. Cybersquatting

The ACPA governs cybersquatting claims against persons who register domain names that are identical or confusingly similar to another's trademark with a bad faith intent to profit from that mark. 15 U.S.C. § 1125(d). Under § 1125(d)(1)(A)(ii), the asserted mark must be "distinctive **at the time of registration** of the domain name." *Id*. (emphasis added). The requirement of "a bad faith intent" is set forth in a separate subsection, namely § 1125(d)(1)(A)(i). The "bad faith intent" requirement of subsection (i) should not be conflated with the separate requirement that the trademark-in-suit to actually exist "at the time of the registration of the domain name" in subsection (ii).

4

The term "registration" is not expressly defined in the ACPA, and there is a circuit split on how to define that term depending on whether a domain name is viewed as a **property** right or a **contract** right.

### 1. Property Approach

The Ninth Circuit in *GoPets* chose to interpret the ACPA "in light of traditional property law . . . conclud[ing] that Congress meant 'registration' to refer only to the initial registration." *Id.*, 657 F.3d at 1031. Interpreting 15 U.S.C. § 1125(d)(1) through the lens of property law, the Ninth Circuit concluded that, like other forms of property, domain names are alienable. *Id*. ("The general rule is that a property owner may sell all of the rights he holds in property"). If the term "registration" included subsequent actions such as renewing the registration, transferring the registration, or updating billing information, then the status of the domain name as property could be reassessed at each subsequent point in time which would make "rights to many domain names effectively inalienable, whether the alienation is by gift, inheritance, sale, or other form of transfer." *Id*. at 1032; *see also* William M. Landes & Richard A. Posner, *The Economics of Trademark Law*, 78 Trademark Rep. 267, 267 (1988) ("[T]rademark law . . . can best be explained on the hypothesis that the law is trying to promote economic efficiency.").

### 2. Contract Approach

Other courts, such as the Eleventh Circuit in *Jysk Bed'N Linen v. Dutta-Roy*, have adopted the view that each registration or subsequent re-registration of a domain name was a new contract between the registrar and the registrant. *Id.*, 810 F.3d 767, 771 (11th Cir. 2015); *see also Schmidheiny v. Weber*, 319 F.3d 581, 582 (3d Cir. 2003). Under this approach, the status of a domain name can be reassessed at each re-registration of the domain name after its creation date.

### 3. Reverse Domain Name Hijacking

"Reverse domain name hijacking" is the abusive use of trademark rights to "strip domain names from rightful owners" by accusing them of cybersquatting even though the registration of the domain name was not unlawful. *Domain Vault LLC v. Bush*, No. 14-CV-2621-WJM-CBS, 2015 WL 1598099, at *1 (D. Colo. Apr. 8, 2015) (citing *Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14, 17 (1st Cir. 2001)); 15 U.S.C. § 1114(2)(D)(v).

## IV. DISCUSSION

The question for the Court here is whether to follow the property approach, or the contract approach, with respect to the ACPA. As will be discussed, Mehdiyev respectfully submits that the property approach better promotes efficiency and equity by bringing more certainty to the property rights in a domain name, streamlining litigation under the ACPA, and avoiding undue expansion of that statute. Otherwise, a domain name owner who attempts to sell a domain name on the open market, or simply renews a domain name, potentially risks making it inalienable and subject to predatory litigation by opportunistic reverse domain name hijackers who later adopt a trademark knowing the domain name is owned by someone else. Here, NTC is attempting to hijack the lawfully acquired <*visitqatar.com*> domain name.

### A. Legislative Intent of a "Carefully and Narrowly Tailored" Statute

According to the Congressional Record, the ACPA "is carefully and narrowly tailored to extend to cases where the plaintiff can demonstrate that the defendant registered, trafficked in, or used the offending domain name with bad-faith intent to profit from the good will of a mark belonging to someone else." 145 Cong. Rec. S14696-03, 14713. "Thus, the bill does not extend to innocent domain name registrations by those who are unaware of another's use of the name." *Id*.

The ACPA, however, does not contain an explicit definition of "registration." While it is clear that the initial registration of a domain name constitutes a registration under the ACPA, some courts have held that other subsequent acts might potentially qualify as a registration under the ACPA, including renewing a domain name's registration contract, updating a domain name's billing information, and transferring a domain name from one owner to another. *GoPets*, 657 F.3d at 1032.

It seems unlikely that Congress intended a "carefully and narrowly tailored" statute to be expansively interpreted to place a domain name registration at risk to reverse domain name hijacking after the domain name owner updates their billing information, renews their domain name, or transfers the domain name to another through one of the many domain name marketplaces that exist. Narrowly construing "the time of registration" to mean the initial registration or creation date of the domain name—a single fixed point in time rather than a moving target in time based on subsequent renewals,[2] transfers, or updates—would promote efficiency and further the legislative intent of the statute.

Furthermore, if an original owner's rights associated with a domain name were lost upon transfer to "another owner," then domain names would become "effectively inalienable," which would be contrary to the structure and intent of the ACPA. *GoPets*, 657 F.3d at 1031–32; *AIRFX.com v. AirFX LLC*, No. CV 11-01064-PHX-FJM, 2012 WL 3638721, at *4 (D. Ariz. Aug. 24, 2012).

---

[2] A registration may be renewed between every one to ten years. ICANN, *General Questions*, https://www.icann.org/resources/pages/faqs-84-2012-02-25-en#10 (lasted visited Jul. 29, 2020).

### B. Expanding the Meaning of "Registration" to Include Every "Re-registration" of a Doman Name is Problematic

Treating every "re-registration" exactly the same as an initial "registration" when creating a domain name is problematic. As pointed out in *GoPets*, there are a number of actions that could constitute a "re-registration" of a domain name, including such actions as renewing the registration, transferring the registration, or updating billing information. *Id.*, 657 F.3d at 1030–1.

Under the contract approach of *Jysk* and *Schmidheiny*, a registrant who creates a domain name before a reverse domain name hijacker ever develops any trademark rights, now becomes vulnerable to that hijacker later after renewing the application or even just updating the billing information. A hijacker should not be able to come in and predatorily litigate for ownership of the domain name created beforehand. This would promote neither efficiency nor equity. Limiting the inquiry to the initial registration or creation date of the domain name also would streamline litigation by focusing that the distinctiveness inquiry on that single fixed point in time.

### C. The Property Approach Promotes Equity

With respect to a domain name created and registered before a hijacker ever used its asserted trademark—where the hijacker started using the trademark knowing that the domain name was owned by another—then equity is not served by allowing that hijacker to predatorily litigate for ownership of the domain name.

If the domain name owner were to engage in activity that the hijacker asserts infringed its subsequent trademark rights, then the hijacker could still pursue a traditional trademark infringement claim against the domain name owner—which is exactly what NTC is doing with its trademark counterclaims in this action.

It also would be possible to achieve the same equitable result in *Jysk Bedn Linen v. Dutta-Roy*, using the property approach. In *Jysk*, the defendant, Dutta-Roy, was hired by Jysk in 1999 to create an online-shopping website and to register the <bydesignfurniture.com> domain in Jysk's name, but Dutta-Roy listed himself, not Jysk, as the owner. *Id.*, 810 F.3d at 771–2.

Because the parties were in privity, the plaintiff had asserted other causes of action including unfair competition and conversion under Georgia law. *Id.* Again, the plaintiff was not without remedy under other causes of action.

Moreover, Jysk also could have maintained an ACPA claim under the property approach because although the domain name was registered before it was technically used as a trademark, the preparations in creating the ecommerce website—and hiring the defendant to do it—could have been considered analogous use sufficient to establish distinctiveness at least between those two parties in privity with one another. This also would be analogous to the problem of a preemptive seller who rushes to market in a less-than-bona-fide attempt to preempt a competitor. 2 McCarthy on Trademarks and Unfair Competition § 16:13 (5th ed.); *see also Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 857 (2d Cir. 1982); c*f. FN Herstal SA v. Clyde Armory Inc*., 838 F.3d 1071, 1082, 120 U.S.P.Q.2d 1186 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1436, 197 L. Ed. 2d 649 (2017) (discussing analogous use).

With respect to the Third Circuit's decision in *Schmidheiny*, that decision was addressed and distinguished in *GoPets*, 657 F.3d at 1031:

> The Third Circuit assumed that Weber's initial registration of schmidheiny.com was not covered by [15 U.S.C. § 8131(1)(A)] because it had been made before the passage of ACPA. *See id.* at 581–82. . . . However, we believe that the Third Circuit erred in assuming that Weber's initial registration was not covered by

9

ACPA. . . . If Weber's initial registration violated § 8131(1)(A), as we would hold it did, the Third Circuit's concern evaporates.

Thus, in addition to promoting efficiency and streamlining litigation, the property approach also will promote equity on both sides.

### D. No Cybersquatting Because the *<visitqatar.com>* Domain Name Was Registered a Decade Before NTC Started Using Its Merely Descriptive "#visitqatar" Hashtag

As previously discussed, the accused *<visitqatar.com>* domain name was registered in June 2004, pre-dating NTC's alleged common law trademark rights by over a decade. Exh. A. There was no cybersquatting because NTC's asserted trademark did not exist when the accused domain name was "registered" within the meaning of the ACPA. *GoPets*, 657 F.3d at 1031.

NTC's Counterclaim alleges that the *<visitqatar.com>* domain name was subsequently transferred to Mehdiyev about three months later. [ECF 14 at ¶ 20]. But this does not establish a claim for cybersquatting because there is "no basis in ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner." *GoPets*, 657 F.3d at 1031; *AIRFX.com*, 2012 WL 3638721, at *4.

Should the Court decide to follow the contract approach instead, this issue will have to be revisited because even if "the time of registration" is January 2016, that means NTC will still have to prove that its use of the descriptive "#visitqatar" hashtag acquired distinctiveness in the three months between October 2015 and January 2016. NTC is unlikely to meet such a burden.

First, NTC alleges that "Visit Qatar" is used "to increase awareness of Qatar as a destination for . . . tourists." [ECF 14 at ¶ 8]. The U.S. State Department defines tourism as "a short visit." *Tourism & Visit*, https://travel.state.gov/content/travel/en/us-visas/tourism-visit.html

(last visited July 29, 2020). The words "visit Qatar" are merely descriptive of encouraging tourists to visit Qatar.

Second, NTC's use of "#visitqatar" as a descriptive hashtag on social media should not establish any trademark rights. *See Eksouzian v. Albanese*, No. CV 13-00728-PSG-MAN, 2015 WL 4220478 (C.D. Cal. Aug. 7, 2015) ("hashtags are descriptive devices, not trademarks"); *see also In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1633 (TTAB 2018) ("the use of a hashtag in the social media context plays a functional role in facilitating searches on social media platforms").

It is unnecessary to decide these issues in connection with the present motion. But it should be noted that even if there is no cybersquatting under the ACPA, that does not mean NTC is without remedy. Assuming NTC has developed trademark rights in "Visit Qatar," NTC can still assert trademark infringement—as it has in its counterclaims asserted in this action. [ECF 14].

## V.    CONCLUSION

NTC chose to adopt the descriptive phrase "Visit Qatar" as a trademark for promoting tourists to visit Qatar, knowing that the <*visitqatar.com*> domain name was owned by another party. NTC could have purchased the <*visitqatar.com*> domain name on the open market, but did not do so. Instead, NTC opportunistically initiated a UDRP proceeding to hijack that domain name years later. Granting summary judgment of no cybersquatting under the ACPA will promote efficiency and equity by preventing a belated hijacking of the <*visitqatar.com*> domain name.

Dated:  August 4, 2020.                                 *s/ James Juo*
                                                                                     James Juo
THOMAS P. HOWARD, LLC
842 W South Boulder Rd., #100
Louisville, CO 80027
jjuo@thowardlaw.com
303-665-9845

Counsel for Plaintiff Teymur Mehdiyev

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

Dated:  August 4, 2020.                                    *s/ James Juo*
                                                             James Juo