IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:19-cv-03353-DDD-NRN

TEYMUR MEHDIYEV,

    Plaintiff,

v.

QATAR NATIONAL TOURISM COUNCIL, a Government Authority of Qatar, a/k/a Qatar Tourism Authority,

    Defendant.

---

QATAR AIRWAYS GROUP Q.C.S.C, a Qatari Corporation

    Counterclaimant,

v.

TEYMUR MEHDIYEV,

    Counterdefendant.

---

## ORDER GRANTING PLAINTIFF'S MOTION FOR DISMISSAL AND MOTION FOR PARTIAL SUMMARY JUDGMENT

    This is a cybersquatting and trademark case. In 2004, a non-party to this case purchased the domain name <*visitqatar.com*>. That website sat largely dormant for over a decade until the Qatar National Tourism Council, an arm of the Qatari government, sought to create trademark rights in the phrase "Visit Qatar." After the Council began developing that trademark, Plaintiff Teymur Mehdiyev purchased the <*visitqatar.com*> domain name and developed it as a tourism website. Mr.

Mehdiyev seeks, among other things, declaratory relief stating that he is not a cybersquatter. He has filed a motion for summary judgment on that issue. The Council has filed counterclaims alleging trademark infringement and cybersquatting. And in an added wrinkle, a separate Qatari governmental entity whom Mr. Mehdiyev did not originally sue, Qatar Airways, purported to join this suit by asserting its own claims in the Council's answer to Mr. Mehdiyev's complaint. Mr. Mehdiyev seeks to dismiss or strike Qatar Airways's claims as improperly joined. For the reasons set forth below, Mr. Mehdiyev's motions as to cybersquatting and improper joinder are granted.

## BACKGROUND

Plaintiff Teymur Mehdiyev is a citizen and resident of Azerbaijan. (Doc. 1 at ¶ 7.) Defendant Qatar National Tourism Council is a governmental authority of Qatar. (*Id.* at ¶ 8.) Mr. Mehdiyev acquired the domain name <*visitqatar.com*> in January 2016 via the domain name registrar Name.com, which is located in Colorado. (*Id.* at ¶¶ 10-11.) He then obtained a United States trademark registration for the phrase "VISIT QATAR," and developed <*visitqatar.com*> as a travel booking website. (*Id.* at ¶¶ 11-12.) The Council also claims to have trademark rights in the phrase "VISIT QATAR" subject to a different, supplemental registered mark. (*See* Doc. 14 at pp. 4, 9.)

To have these competing interests adjudicated, the Council filed a complaint with the World Intellectual Property Organization. (Doc. 1 at ¶¶ 17-26.) The WIPO found that <*visitqatar.com*> must be transferred to the Council unless a court with jurisdiction over the matter held otherwise. (*See* Doc. 1 at ¶¶ 23-25; Doc. 14 at ¶¶ 23-25.) Mr. Mehdiyev then filed this suit, seeking a declaratory judgment that he has not infringed on the Council's trademark or unlawfully cybersquatted, and claiming

that the Council reverse hijacked his domain name and tortiously interfered with his contract with the relevant domain name registrar. (Doc. 1 at ¶¶ 27-47.)

In response, the Council filed an answer in which it asserted several counterclaims, including for trademark infringement and cybersquatting. (Doc. 14.) In the same document filed as the Council's Answer, a third-party, Qatar Airways Group Q.C.S.C., also purported to join this suit by filing its own "counterclaims" against Mr. Mehdiyev in the Council's answer to the complaint. (Doc. 14 at pp. 25-42.) In the answer, Qatar Airways relied on Federal Rule of Civil Procedure 19 to argue that it had a right to join the case as a necessary party.

## ANALYSIS

**I.   Motion to Dismiss**

Mr. Mehdiyev first seeks to dismiss or strike third-party Qatar Airways's "counterclaims" against him. He argues that there was no basis for Qatar Airways's intervention or joinder into this suit without leave of court. Mr. Mehdiyev also seeks dismissal on alternative grounds of insufficient service of process and lack of personal jurisdiction. In response, Qatar Airways argues that it properly joined the suit, without leave, pursuant to Federal Rule of Civil Procedure 20.[1]

Federal Rule of Civil Procedure 20 states, in relevant part:
> (1) Plaintiffs. Persons may join in one action as plaintiffs if:
>
> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same

---

[1]   Qatar Airways stated in the Council's answer that it should be joined as a necessary party pursuant to Federal Rule of Civil Procedure 19. (Doc. 14 at p. 25.) But Qatar Airways has not raised that ground for joinder in its opposition to Mr. Mehdiyev's motion to dismiss. The court

transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all plaintiffs will arise in the action.

Federal Rule of Civil Procedure 13(h) provides that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." So "generally, the defendant has a right to file its counterclaim or crossclaim with its responsive pleading. A defendant who does so has the right to join additional parties to the counterclaim or crossclaim without leave of court." 4 Moore's Federal Practice - Civil § 20.02 (2020).

The Council and Qatar Airways argue that they satisfy Federal Rule of Civil Procedure 20(1)(A) because their counterclaims relate to Mr. Mehdiyev's use of a single, allegedly infringing logo. This argument has some significant flaws, however.

First, by its terms, Rule 20 applies to joining an action as plaintiffs. Qatar Airways does not seek to join as a plaintiff, but as a counterclaimant. And while Rule 13 refers to Rules 19 and 20 as governing counterclaims, it does so only as to "the addition of a person as *party to a counterclaim or crossclaim*." The airline here is not seeking to become a party to any counterclaim, but to assert its own related, but distinct claims.

The Council, on one hand, brings a trademark infringement claim as to its "Visit Qatar" mark; brings a cybersquatting claim as to the <*visitqatar.com*> domain; and seeks cancellation of Mr. Mehdiyev's "Visit Qatar" federal trademark registration. In contrast, Qatar Airways brings trademark infringement claims for separate "Oryx Marks" rights and a state-law unfair-competition claim. While Qatar Airways may

---

therefore construes Qatar Airways as seeking permissive joinder under Rule 20 for purposes of this motion.

have licensed the "Visit Qatar" trademark to the Council, Qatar Airways does not join the Council's claim as to that mark and does not assert a claim for relief as to that trademark in the answer. (Doc. 14 at p. 25.)

Likewise, it's not clear that Qatar Airways qualifies as a "counter-claimant" in the first place, given that Mr. Mehdiyev has brought no claims against it and it has not joined the Council's existing counterclaims. Qatar Airways better resembles a third-party plaintiff or intervenor, so Qatar Airways' invocation of Rule 13 is somewhat dubious. The text of the relevant rules does not seem to contemplate this maneuver.

It is perhaps not surprising then that the Council and Qatar Airways have identified no caselaw supporting invocation of Rule 20 in this particular context. They cite two cases, and both are distinguishable. In *Earthmovers, Inc. v. Massey*, a United States Magistrate Judge granted a defendant's request to make two non-parties "plaintiffs to the counterclaim stated in Defendants' Answer and Counterclaim." No. 07-4143, 2008 WL 347695, at *1, *3 (D. Kan. Feb. 7, 2008). But as noted, Qatar Airways is not joining a previously-asserted counterclaim made by an existing party; it's attempting to assert separate claims to which the Council may have no legal interest or right. *Aleynikov v. Goldman Sachs Group, Inc.*, is similar. No. 12-5994, 2013 WL 5816941, at *11 (D.N.J. Oct. 29, 2013). In that case, the joining counterclaimant "assert[ed] precisely the same claim for declaratory relief" as the original defendant. *Id.* And in that case, the joining counterclaimant specifically joined an existing counterclaim asserted by the original defendant. *Id.*

Finally, allowing Qatar Airways to assert its own claims against Mr. Mehdiyev raises concerns as to service of process and personal jurisdiction. Granted, a plaintiff generally consents to the court having personal jurisdiction over counterclaims brought against him by someone he sues.

But it is less clear if that consent extends to independent claims asserted by a third party whom the plaintiff never sued in the first instance, even if those claims may have some factual similarity to the plaintiff's original claims. *See Reedsburg Bank v. Apollo*, 508 F.2d 995, 1000 (7th Cir. 1975) (permissive intervenor must establish an independent basis for jurisdiction); Fed. R. Civ. P. 82 (the Rules "do not extend or limit the jurisdiction of the district courts"). Indeed, plaintiffs are "masters of the complaint" and can narrow their claims and parties to those claims in ways that limit or exclude a federal court's jurisdiction over the case. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 395 (1987) (describing the well-pleaded complaint rule). Similar problems might arise in the context of service of process because Qatar Airways has not followed the requirements of Rule 4 as to its "counterclaims." While a true counterclaim brought by an existing defendant may not require separate service under Rule 4, as Qatar Airways notes, that proposition does not necessarily extend where a third party joins a lawsuit, without leave, and asserts its own claims against a plaintiff.

Given these concerns, the court declines to exercise its discretion to allow Qatar Airways to join the case at this time. *See Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 839 (11th Cir. 2017) (district courts have "broad discretion to join parties or not" (internal citation and quotation marks omitted)). Even if Qatar Airways meets the technical requirements of Rule 20, "district courts have the discretion to refuse joinder in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness." *Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 202 (5th Cir. 2017). Allowing joinder in this context raises substantial fairness and due process concerns that have not been fully briefed, so the court will not exercise its discretion to allow joinder of Qatar Airways. The court will therefore

dismiss Qatar Airways's "counterclaims" without prejudice. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); *see also Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 522 (5th Cir. 2010) (noting that the proper remedy for misjoinder is to grant severance or dismissal as to the improper party if it will not prejudice any substantial right).

## II. Motion for Summary Judgment

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment "if but only if the evidence reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1190 (10th Cir. 2009). The court views "the facts and all reasonable inferences those facts support in the light most favorable" to the Council. *Id.* at 1189–90. "An issue of material fact is genuine only if the nonmovant presents facts such that a reasonable factfinder could find in favor of the nonmovant." *S.E.C. v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (alteration adopted). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. Proc. 56(e)(2).

Mr. Mehdiyev separately moves for partial summary judgment as to his claim for a declaratory judgment that he is not cybersquatting. To violate the cybersquatting statute, as relevant to this case, Mr. Mehdiyev must:

> (i) ha[ve] a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) register[], traffic[] in, or use[] a domain name that--

> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A).

Mr. Mehdiyev's motion focuses on the second statutory element, arguing the Council's mark was not distinctive when <*visitqatar.com*> was registered. This requires the court to answer a question of statutory interpretation: what is "the time of registration" for purposes of cybersquatting under 15 U.S.C. § 1125(d)(1)(A)? Mr. Mehdiyev argues there are no disputed material facts because the parties agree the domain in question was first registered in 2004, and the Council did not begin developing Visit Qatar as a trademark until years later. He thus argues that the Council's mark was not distinctive at the time of registration and he cannot be violating this provision.

The Council contends the term "time of registration" is much more complicated, involving multiple factors like the chain of ownership of the domain, and how various owners interacted with the registry. Consideration of these factors, according to the Council, establishes that what Mr. Mehdiyev did after acquiring the domain amounted to a "re-registration." On this view, Mr. Mehdiyev would not be entitled to summary judgment because his actions post-date the Council's distinctive mark.

Who is right appears to be an open question in the Tenth Circuit, and some circuits have split on this issue. Ultimately, because the court does not find support in the statue for the concept of "re-registration" on which the Council's cybersquatting arguments rest, it agrees with Mr. Mehdiyev. But getting there requires a bit of background on the basics of the domain registration and aftermarket sales process.

A domain name is created when it is registered with a registry operator that maintains the registry that associates domain names with the proper IP numbers for the respective domain name servers. *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698–99 (9th Cir. 2010). Registrars, which are distinct from registries, facilitate the purchase of available and expired domain names to registrants and work with registries to ensure that domain names are properly registered. *See id.* The entire process of registering domain names is overseen by the non-profit Internet Corporation for Assigned Names and Numbers. *See id.*

At the time of initial registration, the registrant pays the registrar a fee for the domain name and provides contact, billing, and technical information. *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011). After registering, a domain-name owner can modify the registration by updating contact information and billing information, for example. *See id.* A registrant also can switch registrars but maintain all the same contact information. *See id.* Relevant here, a domain-name owner can transfer ownership in the domain name with the new owner keeping the same registrar. At least for domains registered by Name.com, the relevant registrar in this case, Name.com appears to facilitate the sale of after-market domains that are already registered to third-parties. (*See* Doc. 41-3 at p. 5.) While Name.com facilitates those sales, it cannot guarantee that a domain-name owner will sell its domain-name rights that were "initially registered." (*Id.* at p. 5.) Name.com appears to label these transactions alternatively as after-market "registrations" or "transfers." (*See id.* at p. 6.)

Here, it is undisputed that a non-party to this suit originally registered the domain name <*visitqatar.com*> in 2004. And it is undisputed that the Council began using "Visit Qatar" in October 2015. Based on these facts, Mr. Mehdiyev seeks summary judgment, arguing that the

Council did not have a distinctive mark "at the time of registration." 15 U.S.C. § 1125(d)(1)(A)(ii)(I). Mr. Mehdiyev claims that there is a single time of registration in this case: 2004. The Council argues that Mr. Mehdiyev's subsequent acquisition of the domain name in 2016 was also a "registration" or a "re-registration" of the domain because it may have involved updating information with the relevant registrar and possibly a new registry. In that case, the Council argues, the domain name was "registered" after it had created a similar, distinctive mark. Who is right appears to be an open question in the Tenth Circuit.

In cases of statutory interpretation, the court must "begin and end our inquiry with the text, giving each word its ordinary, contemporary, common meaning." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (internal citation and quotation marks omitted). But "interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Id.* (internal citation and quotation marks omitted).

The main text at issue is: "the time of registration of the domain name." 15 U.S.C. § 1125(d)(1)(A)(ii)(I).

Read plainly, the statute suggests that registration is a singular event that occurs at a fixed point in time—literally "time of registration"—not some shifting occurrence that slips in and out of existence depending on a grab-bag of factors as the Council argues. The canon against surplusage supports this conclusion. Elsewhere in the Act, Congress made explicit distinctions between the time of "acquisition" and the "time of registration." *Id.* § 1125(d)(B)(VIII). To hold that a trademark is re-registered after each acquisition of a domain name would render the specific references to acquisition in § 1125(d)(B)(VIII) meaningless. *See Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037

(2019) (noting that courts generally presume that statutes do not contain surplusage).

The circuit courts to have addressed this issue are split. The Ninth Circuit has held, on the one hand, that the "time of registration" refers only to the initial registration of a domain name and not to aftermarket sales or acquisitions. *GoPets v. Hise*, 657 F.3d 1024, 1031-32 (9th Cir. 2011). The court noted that reading "registration" to also mean "re-registration" would allow initial registrants to have rights in their domain name that would evaporate, at least practically if not legally, when transferred to another party because no one would buy rights to a domain name that would be rendered subject to a cybersquatting lawsuit upon the transfer. The court saw no indication that the statute would restrict the alienability of domain names in this way. *Id.* (noting that "the general rule is that a property owner may sell all of the rights he holds in property" and that "nothing in the text or structure of the statute" indicates otherwise in this context).

The Third and Eleventh Circuits have reached the opposite conclusion. *Jysk Bed'n Linen v. Dutta-Roy*, 810 F.3d 767 (11th Cir. 2015); *Schmidheiny v. Weber*, 319 F.3d 581 (3d Cir. 2003). Both involve what those courts call "re-registration" of a domain, and in at least one of them, the decision depended on a finding that the registration had expired before being re-registered. *Jysk*, 810 F.3d at 772. Since the evidence is undisputed that this domain has been continuously registered since 2004, to the extent the marks in those cases were in fact expired and later registered anew, those cases may be distinguishable.

Even if these cases were not distinguishable from the facts here, the court is not persuaded that a transfer of ownership, renewal, change in address or other registration information can effect a "re-registration"

of a domain that has been continuously registered, as the Council argues. First, the concept of "re-registration" has no basis in the text. That term does not appear anywhere in the statute.[2] And the text, as noted, speaks of a singular point in time: "the time," not "the times" or the "time of registrations." The plain meaning of this is that a registration is a single event, not something that is redone via the sort of background changes the Council suggests.[3] This understanding is corroborated by the database used to record the domain names in existence, maintained by ICANN, which says that the <*visitqatar.com*> domain has been registered since 2004.[4]

The Third and Eleventh Circuit cases both rely heavily on a negative inference from the fact that the statute does not limit its application to the "initial" or "first" registration. *Jysk*, 810 F.3d at 777; *Schmidheiny*, 319 F.3d at 582. But that inference only makes sense if you've already decided that there can be multiple registrations and re-registrations. If there is only one "time of registration," as the text states, then there is no reason to include a qualifier such as "initial" or "first." The fact that the statute does not discuss multiple registrations, to this court, supports rather than undermines the conclusion that, consistent with the

---

[2] The Eleventh Circuit also noted that the ordinary meaning of "re-registration" simply means registering anew. *Id.* True enough. But that word does not appear in the statute, so it is unclear why its definition is relevant.

[3] The relevant code chapter does include the instruction that "words used in the singular include the plural and vice versa" "unless the contrary is plainly apparent from the context." 15 U.S.C. § 1127. The context here is plainly to the contrary.

[4] The court takes judicial notice of the public "whois" domain registration data for visitqatar.com, accessible at https://www.lookup.icann.org/lookup. That entry lists two dates relevant to registration of the domain: the date "created" (June 10, 2004) and the current "registry expiration" (June 10, 2022).

plain reading of the text, Congress contemplated only a single time of registration.

In fact, courts addressing this issue have referred to these aftermarket sales of domain names as "re-registrations," but it is not clear why (other than perhaps in the case of expired registrations) they are not simply understood as transfers or updates of registrations.[5] While the transfers of domain names appear to require some coordination with at least registrars, the process does not appear to directly mirror the process of initial registration of a previously unclaimed domain name. The fact that courts are not comfortable calling them registrations, but have developed the extra-textual term "re-registrations" suggests that a re-registration is not, in fact, a registration.

Finally, the court does not see how the alleged purpose of the statute can overcome these textual arguments. The Eleventh Circuit noted that the Act's purpose was "to prevent cybersquatting." *Id.* at 777. And it seems clear that the courts were put off by fairly obvious bad-faith actions by the registrants in those cases. *See Jysk*, 810 F.3d at 777 (finding that "it would be nonsensical to exempt the bad-faith re-registration of a domain name"); *Schmidheiny*, 319 F.3d at 582.[6] But if Congress had

---

[5] The Council cites several district court cases that found that "re-registrations" also constituted a "registration" under § 1125(d)(1). But many of those district courts were bound by the in-circuit decisions of either the Eleventh Circuit *Jysk* decision or the Third Circuit's earlier decision in *Schmidheiny* that parallels the reasoning in *Jysk*. Caselaw on this issue outside of those circuits is quite limited, and to the extent other district courts have voluntarily come to the same conclusion as the *Jysk* and *Schmidheiny* courts, this court respectfully disagrees. *See, e.g., Xereas v. Heiss*, 933 F. Supp. 2d 1, 16 (D.D.C. 2013) (relying, in part, on legislative history to determine the meaning of the "time of registration").

[6] *Schmidheiny* is also distinguishable from the facts here. The Third Circuit limited its holding to new contracts "at a different registrar and

wanted to prohibit any such bad-faith use of a registration, it could have saved everyone a lot of trouble by not limiting § 1125(d) to domains that were registered after a similar mark became distinctive.

And so while the Eleventh Circuit is right that the purpose of the statute is to prevent cybersquatting, that does not answer the question: what is cybersquatting? Just as physical squatting involves a newcomer occupying another's property without any right to it, cybersquatting depends on who had the right in the first place. *Squatter*, Black's Law Dictionary (11th ed. 2019). There is no dispute here that Mr. Mehdiyev's predecessor registered <*visitqatar.com*> prior to the Council's mark becoming distinctive, and was thus not cybersquatting. And there is no dispute that Mr. Mehdiyev legally acquired the predecessor's legal interest in the domain. Acquiring another's legal interest in property (intellectual or otherwise) is not squatting.

Other policy problems arise from the Council's proposed approach. First, it complicates both the registration process and the litigation process. As noted, ICANN lists a single registration date for a registered domain. The litigation complications of looking not at that ICANN date but to any variety of public and non-public information to decide when a domain was registered are obvious. And as these cases show, that date is important for many reasons beyond litigation, in particular that someone considering putting in the effort to develop a trademark can ascertain quickly and easily if someone else has registered a domain they

---

to a different registrant," whereas here, the same registrar was maintained. 319 F.3d at 582. That court also dealt with an initial domain registration that occurred prior to the enactment of the Anti-cybersquatting Act and a subsequent "re-registration" that occurred after enactment, which is not the case here. 319 F.3d at 581-82.

- 14 -

might want. Adding confusion and uncertainty to that process is not consistent with the statutory text or in anyone's long-term interest.

And this raises a final policy point. While § 1125(d)'s obvious purpose is to prevent cybersquatting, it also helps provide those who own or are developing potentially distinctive marks an incentive to either choose marks that are not similar to domains that are already registered, or, perhaps, to purchase those domains before they expend significant goodwill creating their similar marks. Allowing a mark owner to undo an otherwise valid, pre-existing registration by calling it cybersquatting would be akin to building a house on land subject to another's lien and calling the lienholder a squatter. The incentives created by allowing that possibility undermine the broader purposes of the Act, and are not necessary to prevent true cybersquatting.

Here, the undisputed facts are that the Council developed its mark after *<visitqatar.com>* was registered and now seeks to get around that fact because the registration was transferred. But the statute does not turn on the ownership or time of transfer of domains—it turns on the time of registration. And so § 1125(d) does not apply, and Mr. Mehdiyev is entitled to partial summary judgment.

## CONCLUSION

Mr. Mehdiyev's motion to dismiss Qatar Airways's counterclaims (Doc. 32) is GRANTED, and Qatar Airways's counterclaims (Doc. 14 at pp. 32-36) are DISMISSED WITHOUT PREJUDICE.

Mr. Mehdiyev's motion for partial summary judgment (Doc. 38) is GRANTED.

It is ORDERED that:

As a matter of law, Mr. Mehdiyev's acquisition of the <*visitqatar.com*> domain name does not constitute cybersquatting for purposes of 15 U.S.C. § 1125(d) in relation to the Council's "Visit Qatar" or "VisitQatar" trademarks.

DATED: April 1, 2021

BY THE COURT:

_____
Hon. Daniel D. Domenico
United States District Judge